# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                        **Case No. 1:18-CR-07**
                                              **(JUDGE KEELEY)**

**EMORY CHILES,**

        **Defendant.**

## REPORT & RECOMMENDATION

This matter comes before the Undersigned pursuant to the District Court's order (ECF No. 50) referring Defendant's "Motion to Suppress Physical Evidence" (ECF No. 49), filed March 27, 2018, to the undersigned for consideration. On March 18, 2018, the Government filed a one-page response in opposition, stating that it "disagree[d] with the facts as presented by defendant, as well as defendant's conclusions." (ECF No. 52). On April 2, 2018, came the Defendant, in person and by counsel, Assistant Public Defenders L. Richard Walker and Beth Gross; and the Government, by Assistant United States Attorney Zelda Wesley, for a hearing on the motion. Subsequently, on April 3, 2018, the Government filed a memorandum (ECF No. 61) in support of its response in opposition. On April 4, 2018, Defendant filed a reply memorandum. (ECF No. 65). Accordingly, this matter is now ripe for a report and recommendation. For the reasons explained below, the undersigned recommends that Defendant's motion to suppress be denied.

## I. BACKGROUND

Defendant's motion arises out of events during a traffic stop on the evening of November 2, 2017, beginning at approximately 10:15 p.m. On that evening, Deputy Sheriff Daniel Oziemblowsky and canine ("K9") officer Sergeant R. A. Stockett of the Monongalia County Sheriff's Department were working on 1-79 near the Pennsylvania-West Virginia border. A Volkswagen Golf passed by Oziemblowsky, who noticed that a "passenger side tail light was not functioning." Oziemblowsky testified that at this point, he told Stockett a car had just passed with a "burned out tail light," they both got back into their patrol vehicles, and the two officers proceeded down I-79 South to catch up to the vehicle. Oziemblowsky called into the Monongalia Emergency Centralized Communications Agency ("MECCA 911") dispatch center to run the vehicle's plates. After turning on his lights to initiate a traffic stop, but before the vehicles had come to a stop at the side of the road, Oziemblowsky switched on his body camera, capturing the events of the stop on video beginning at approximately 10:16 p.m.

A MECCA 911 operator radios Oziemblowsky to advise the vehicle registration is "clear NCIC" - i.e., not stolen - and that she is "not sure what kind of make it is." Oziemblowsky advises he is going to be "on the stop of that vehicle" on 79 southbound at mile marker 155 and a half, and that the license is displayed on a "Volkswagen, it looks like a Golf, silver in color." Oziemblowsky exits his vehicle and approaches the vehicle to speak to the driver, advising he has pulled him over is because the passenger side tail light is out. After the driver responds, "Really?" Oziemblowsky clarifies that while the brake lights on the vehicle are working, the tail light is not. Oziemblowsky requests the driver's license, registration, and proof of insurance. The driver, Trevor Townsend, advises that he does not have a valid license, as it was suspended for a DUI five years ago and has not been reinstated. Townsend further advises that the vehicle was

just purchased and does not yet have a valid registration or insurance, though there was a bill of sale in the glove compartment, which Oziemblowsky asks him to retrieve. Defendant Chiles, the passenger, informs Oziemblowsky that he is recording the stop for his protection. Oziemblowsky advises "That's fine;" that the officers' body cameras are also recording, and they all have a right to record the stop. Townsend asks if he can call his mother to come arrange to have the car towed, which Oziemblowsky tells him is fine. Oziemblowsky then turns back to his patrol car to "run everything." On his way back, he passes Sergeant Stockett who states he will check on Defendant's identification.

Back at his patrol car, Oziemblowsky again radios with MECCA 911 and asks the operator if she "ever got any return on that 28 that I ran? I know you said that it didn't provide what make it was or model." The operator advises that it "came back with a name," as well as a Vehicle Identification Number ("VIN"). "I'm not sure what that means," she states, "but it doesn't have any [inaudible] on it." Oziemblowsky asks for the last four numbers of the VIN, which she provides. Oziemblowsky returns to the Volkswagen momentarily, says "Okay, that's not the right plate," and walks back to his patrol car. "Give me the plate again," the operator radios back; "maybe I ran it wrong." Oziemblowsky responds "No, there's nothing legal on this vehicle, MECCA; it doesn't belong on it." Stockett is conversing with Defendant at his window, getting his identification and asking where the two had come from. Oziemblowsky gets back in his patrol car and provides Townsend's identification information for MECCA to run. After clarifying the number, MECCA responds that it is "showing expired, to a Trevor Townsend."

Oziemblowsky then converses with a male about needing a "shift cars" and provides his location. Stockett approaches the window of Oziemblowsky's patrol car. "Tell me you're going to run the dog on this one," Oziemblowsky says. Stockett responds "Yeah," advising

Oziemblowsky that Defendant told him he had spent eighteen years in the pen for "drug stuff." "Did you see where he's from?" Oziemblowsky asks - "the Bronx." Stockett advises when Oziemblowsky is ready, i.e., able to watch the two while Stockett conducts a canine sniff, he will run the dog around the car. Oziemblowsky tells Stockett that he is still waiting for 1) a unit (the shift car) to arrive, 2) a return on Townsend, and 3) to run Defendant's identification, which he had not had a chance to do yet. Stockett advises he will stay with the two at the Volkswagen to watch them until Oziemblowsky is free.

Oziemblowsky then radios in Defendant's identification to have that run as well, which comes back suspended. "Any luck on [Townsend]?" Oziemblowsky asks. After waiting for a short time, Oziemblowsky gets out of his patrol car and advises Stockett that he is "still waiting on returns and such, so, while we're waiting on that, if you want to run the dog…" Stockett confirms that he does: "[Defendant] is already telling me his rights and stuff, he wants to get out of the car, and stand, and…" Stockett is interrupted by the radio, confirming Townsend's license was revoked for a DUI offense.

Stockett approaches the Volkswagen and has Townsend get out and come back to stand with Oziemblowsky, who asks Townsend if he has had any luck reaching his mother to arrange to have the vehicle towed. Townsend advises he has not been able to reach her or his brother yet, who he texted, but was slow to respond. Oziemblowsky asks Townsend if he has any weapons on him; Townsend responds that he had only the pocketknife, which he left in the car. Oziemblowsky conducts a pat-down of Townsend, who is standing next to him, "just to make sure [he] didn't have any weapons on [him]." Townsend then places a call to his brother on his cell phone.

At this time, Stockett brings Defendant over to the area where Oziemblowsky and Townsend are standing, though Defendant is a few feet further away. Defendant holds his phone up and speaks into it, "This is Emory Chiles, I'm recording a traffic stop as a passenger. Travis got pulled over for a tail light being out; he had a suspended license…" Townsend converses on the phone with his brother, telling him that they have been pulled over and the Volkswagen has to be towed, and asking him to have his mother call him. Oziemblowsky asks Defendant to stay back from the highway for his safety, due to passing vehicles. Stockett runs the dog around the vehicle, where it can be heard barking. Oziemblowsky asks if there is anything in the vehicle, which Townsend and Defendant deny. Townsend explains that he has not had anything in the vehicle, as it has been parked in a garage, but that he has "been around weed smoke often." Stockett goes back to the Volkswagen to search it pursuant to the canine alert.

Twenty minutes into the stop, Townsend talks to his mother on the phone explaining where the Volkswagen is so that she can try to arrange to get it off the highway. Stockett is still searching the Volkswagen at this time. As soon as Townsend hangs up, Oziemblowsky asks Defendant, who has been facing away from him recording Stockett searching the vehicle, if he has any weapons on him. Defendant responds in the negative, stating he had a pocketknife but it was left in the vehicle earlier when talking to Sergeant Stockett. Oziemblowsky asks Defendant if he minds if he pats him down for safety reasons, since they are now in close proximity. Defendant does not consent to the pat down. After Oziemblowsky and Defendant debate this and Defendant continues to insist there is no legal basis for the pat down, Oziemblowsky advises that he can pat Defendant down and calls Sergeant Stockett over to assist him in so doing. Up to this point, at 22:37:29, Oziemblowsky's camera points back towards the patrol vehicle and no other officers are visible or appear to be on scene yet. At 22:37:41, Townsend can be seen standing in

front of the patrol vehicle, but no other officers are visible still. Approximately twenty one minutes into the stop, at 22:37:44, Oziemblowsky pats Defendant down and finds a gun on his person.

At 22:37:49, Oziemblowsky's body camera shows another officer standing next to the parked patrol vehicle – presumably, the officer from the requested "shift car" who has recently arrived. After cuffing Defendant and putting the gun in a patrol vehicle, Oziemblowsky continues the pat down and finds what are alleged to be bags of "dope" in Defendant's pocket. Subsequently, based on these events, Defendant was indicted on one count of Possession with Intent to Distribute Heroin, in violation of 18 U.S.C. § 924(c)(1)(A)(i); one count of Use of a Firearm During and in Relation to a Drug Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and one count of Unlawful Possession of a Firearm, in violation of 18 U.S.C. §922(g)(1) and 924(a)(2). (ECF No. 5).

## II. THE PARTIES' CONTENTIONS

### 1. Defendant's Motion to Suppress

In his motion, Defendant raises four arguments. First, Defendant argues that the officers lacked probable cause to stop the Volkswagen for two reasons: 1) because the left "tail light" of the vehicle was *not* out; rather, the light was visibly – albeit less brightly - illuminated on the video of the traffic stop; and 2) because the discrepancy in the registration was not known to the officers until *after* the Volkswagen was stopped. (ECF No. 49 at 9-10). Second, Defendant argues that the officers lacked reasonable suspicion to detain him because he was merely a passenger and was uninvolved in the alleged violations of law committed by the driver of the vehicle which led to the stop in the first instance. Id. at 10-11. Third, Defendant argues that the stop was "unlawfully and unnecessarily extended . . . in order to conduct a search with a dog."

<u>Id.</u> Fourth, Defendant argues that the officers lacked reasonable suspicion to believe he was armed and dangerous, and thus lacked grounds to conduct the <u>Terry</u> pat-down of Defendant's person. <u>Id.</u> at 12.

### 2. Government's Opposition

The Government argues that the traffic stop was justified based on the "burned out taillight, and also because the plate did not match the vehicle," and that the officers' actions were reasonably related in scope to the basis for the detention. (ECF No. 61 at 11-12). Second, the Government argues that the officers had a "reasonable articulable suspicion of criminal activity" because the Defendant was "making a 'bigger deal' than necessary" about recording the stop, had called Townsend by the wrong name, was from the Bronx, had recently gotten off parole after serving eighteen (18) years in prison, and the plate on the Volkswagen did not belong to that car. <u>Id.</u> at 12. Third, the Government argues that the traffic stop was not extended because it "never concluded before Defendant was arrested," as the officers were still "address[ing] the issue" of how to transport Townsend, Defendant, and the Volkswagen away from the scene of the stop on I-19. <u>Id.</u> at 12-13. Moreover, the stop could not have been extended to permit the K9 sniff around the vehicle because the K9 unit was already on scene. <u>Id.</u> at 13. Fourth, the Government argues that the officers had a reasonable belief that Defendant was armed due to Defendant's criminal history, the K9's alert on the vehicle, and Defendant's statement that he had had a knife on him, because Oziemblowsky did not know for certain it had been left in the vehicle and did not have to take Defendant at his word. <u>Id.</u> at 13-14.

### 3. Defendant's Reply

In his reply, Defendant first reiterates that the stop was not justified because "portions of the [officers' body camera] videos seem to show both tail lights emitting red light," and because

the officers did not learn about the license plate discrepancy until after he had initiated the stop. (ECF No. 65 at 1-2). Defendant further argues that although Oziemblowsky testified that he observed a tail light out on the vehicle, Oziemblowsky's credibility was at issue because he 1) admitted that he had intentionally covered his microphone during the stop in order to prevent it from recording a conversation about the illegality of the search; and 2) denied having any involvement in prior cases where a Fourth Amendment violation was found, which is objectively false per State v. Feicht. (ECF No. 65 at 2, referring to ECF No. 65-1). Second, Defendant reiterates a lack of reasonable articulable suspicion of criminal activity, arguing that there is nothing suspect about Defendant recording a police interaction or Defendant confusing Townsend's name slightly. Id. at 3-4. Moreover, Defendant's New York identification likewise is not suspect because the Government provided no specific evidence that the Bronx is a "source city" of narcotics for West Virginia, and even if it was, 1-79 is not a route that would be traveled between the Bronx and Morgantown. Id. at 4-5. Third, Defendant reiterates that the officers' actions clearly exceeded the scope of the basis for detention, given that all of the alleged traffic violations were committed by Townsend, and Defendant was merely a passenger who was not involved. Id. at 7. Moreover, when Defendant asked if he was being detained and indicated a desire to leave, he was not permitted to. Id. Fourth, Defendant reiterates that Oziemblowsky lacked a reasonable belief that he was armed and dangerous warranting a Terry pat down because Oziemblowsky did not know about Defendant's prior firearm possession conviction at the time the pat down occurred, and while Oziemblowsky did know about Defendant's prior *drug* conviction, that is not a reasonable basis on which to conclude Defendant was armed. Id. at 8. Defendant argues that the K9 alert likewise cannot provide reasonable suspicion that he was armed, as those dogs are trained to detect narcotics, not weapons. Id. In addition, Defendant

argues that the fact that Defendant had a pocketknife on him at the time of the stop, which he left in the center console of the Volkswagen upon being made to exit, provides no logical basis to assume that he had, or needed to be searched for, additional weapons. Id. at 9-10.

## III. ANALYSIS

Detaining persons during a traffic stop by the police, even briefly and for a limited purpose, is a "seizure" under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1994). It is the Government's burden to demonstrate that seizure it seeks to justify on basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy conditions of investigative seizure. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1983). The propriety of a traffic stop is considered under the two-pronged inquiry articulated in Terry v. Ohio, 392 U.S. 1. (1968). The first prong is "whether the police officer's action was justified in its inception." U.S. v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). The second prong is "whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id. If the occupants of a vehicle are detained *beyond* the scope of a routine traffic stop, the officer must be able to articulate "reasonable suspicion that criminal activity is afoot." U.S. v. Brugal, 209 F.3d 353, 357 (4th Cir. 2000) (en banc), quoting Rusher.

1. **The stop was justified in its inception because the officers had reasonable suspicion that the tail light of the Volkswagen was not in proper working condition under West Virginia law.**

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." U.S. v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) citing Illinois v. Caballes, 369 F.3d 776, 407 (2005). Under the first prong of the Terry inquiry, whether the law enforcement action was

'justified in its inception' in this instance hinges on whether the officers observed a traffic violation sufficient to initiate the stop. "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken.'" U.S. v. Rusher, 966 F.2d 868, 875 (4th. Cir. 1992), quoting Maryland v. Macon, 472 U.S. 463, 470-71, 105 S.Ct. 2778, 2783 (1985).

The Government argues that the stop was justified "based on the burned out taillight and also because the plate did not match the vehicle." (ECF No. 61 at 11). However, as Defendant argues, and as Oziemblowsky's body camera video shows, Oziemblowsky initiated the traffic stop *before* receiving information about the plate/registration of the Volkswagen from MECCA 911 dispatch.[1] Thus, the only "facts and circumstances confronting [Oziemblowsky] at the time" he initiated the stop was the Volkswagen's tail light. Terry, 392 U.S. at *28.

Under West Virginia law, it is a misdemeanor offense to drive a vehicle with a tail light that is not in "proper working condition." Strick v. Cicchirillo, 224 W.Va. 240 , *244, 683 S.E.2d 575, **580 (2009) ("when one or more of the tail lamps on a vehicle . . . are not in proper working condition, the provisions of West Virginia Code § 17C-15-1(a) are violated.").

---

[1] Deputy Oziemblowsky's lights can be seen flashing, and thus the stop initiated, at 22:16:19 - *before* a MECCA 911 operator responds to advise that the Volkswagen was "clear NCIC" - i.e., not stolen - and that she was "not sure what kind of make it is." This statement objectively does not rise to the level of a discrepancy. Oziemblosky testified that the statement meant that the plate did not match the vehicle. However, even if this is true, the video shows that as both vehicles were pulling off to the side of the road, Oziemblowsky radioed at 22:16:26 "that license is displayed on a Volkswagen, *it looks like* a Golf, silver in color," - indicating that he himself was not yet sure of the vehicle make and model at the time of the stop. Oziemblowsky further testified on direct examination at the motion hearing that "without running the VIN at that point, I did not know to what state it should have been registered in." Lastly, upon approaching the Volkswagen, Oziemblowsky informed Townsend that he "had pulled him over for the tail light not functioning correctly," - with no mention of a concern about, or discrepancy in, vehicle registration. Defendant argues, and the Government concedes, that Oziemblowsky did not learn that the plate was in fact registered to a Maserati until "later." (ECF No. 61 at 8, fn. 1). Lastly, up until 22:21:13, the issue of registration was still being determined, as the MECCA 911 operator can be heard saying "Okay, give me the plate again, maybe I ran it wrong" and Oziemblowsky finally concludes that the registration definitively does not belong to the Volkswagen. Taken together, all of these facts support a finding that at the time Oziemblowsky initiated the stop, the most that could be fairly said is that he was waiting to find out if there *was* anything amiss with the registration.

Accordingly, the issue is whether the passenger tail light Volkswagen in which Defendant was a passenger was in 'proper working condition' or not.

Defendant argues that, according to the driver of the Volkswagen, all of the tail lights on the Volkswagen were on before he and Defendant left Ohio, and the officers' body camera videos do not appear to contradict this claim:

> Mr. Townsend recalls circling the vehicle and conducting a visual inspection on November 2, 2017, prior to driving from Ohio to West Virginia, where he was stopped. According to Mr. Townsend, all tail lights were on. This seems to be corroborated by Deputy Oziemblosky's body camera video disclosed to undersigned counsel. <u>See</u> Exhibit A. Portions of the video seems [sic] to show both tail lights emitting red light. One tail light appears somewhat brighter, but neither is "out," as alleged by the officer in his report.

(ECF No. 49 at 9). Defendant further argues that while Oziemblowsky testified that the tail light of the Volkswagen was out, Oziemblowsky also admitted on cross examination that he had "intentionally cover[ed] the microphone on his body camera during a conversation [between the two] about [the legality of a] search" of the vehicle, thus casting doubt on Oziemblowsky's credibility. (ECF No. 65 at 2). Defendant further argues that Oziemblowsky falsely testified that he had never been involved in a case where a Fourth Amendment violation was found before. <u>Id.</u>

However, while concerning, as to the tail light Deputy Oziemblowsky's credibility is not of great relevance on this point because the undersigned need not rely on the officers' word; body camera videos from both Oziemblowsky and Sergeant Stockett are in evidence. Having viewed the video from Oziemblowsky's body camera in the moments between the stop being initiated and the Volkswagen pulling over, it is difficult to say with complete certainty that the tail light is completely "out." However, under West Virginia law, the officers need not have had reasonable suspicion that the tail light was completely out. Rather, the issue is whether the officers had reasonable suspicion to believe that the tail light was not in "proper working

condition" as required by West Virginia Code § 17C-15-1(a).

Because it is clear from Deputy Oziemblowsky's body camera video that the passenger side tail light was, at minimum, noticeably dim in comparison to the driver's side tail light – a fact that Defendant concedes (ECF No. 49 at 10) – the undersigned finds that the officers had, at minimum, reasonable suspicion to believe that the tail light was not in "proper working condition." See, e.g., State v. Brown, No. 16-0154, 2017 WL 969152 (W. Va. March 13, 2017) (unpublished opinion) and State v. Hill, No. 16-0168, 2017 WL 13652311 (W. Va. April 10, 2017) (unpublished opinion) (a turn signal with a *working* light but a cracked lens was not in "good working condition" as required by West Virginia law, sufficient to sustain a traffic stop even when the officer who initiated the stop mistakenly thought a tail light was out).

Accordingly, the undersigned finds that the stop was lawful and justified from its inception, and the first prong of Terry is satisfied. The next issue is whether the stop was extended beyond the time necessary to accomplish the stop's purpose.

2. **The duration of the stop was not measurably extended beyond the time reasonably necessary to accomplish the stop's purpose, by either Sergeant Stockett's inquiries to Defendant or the dog sniff around the vehicle, because Deputy Oziemblowsky had not yet written citations to Townsend, he did not delay in doing so, the dog was already on site, and the officers were still waiting on arrival of the shift car and for Townsend to arrange transportation of the Volkswagen.**

The "tolerable duration [of a stop] is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop, Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 and attend to related safety concerns." Rodriguez v. U.S., 135 S.Ct. 1609, 1611, 191 L.Ed 492 (2015). "An officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver

is subject to outstanding warrants." U.S. v. Hill, 852 F.3d 377, 382, (4th Cir. 2017) quoting Rodriguez, 135 S.Ct. at 1615.

A lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission' of issuing a ticket. U.S. v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018) (citing Caballes, 543 U.S. at 407). However, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." U.S. v. Mason, 628 F.3d 123, 131, quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009). "Direct[ing] one minute of [] questioning *to the passenger* [of the stopped vehicle] does not alter the calculus." Id. at 132 (emphasis in original).

The undersigned cannot say that the stop here was extended beyond the time reasonably necessary to accomplish the stop's purpose because, at the time Defendant was frisked, the officers had not yet written a citation to Townsend for the violations. Moreover, while Defendant alleges that the officers "slow-played" the investigation in order to convert a traffic stop into a full blown drug investigation, it cannot be said that the officers proceeded "in a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop," U.S. v. Nestor, No. 1:17-CR-43, 2018 WL 447618, 9 (N.D.W.Va. Jan. 17, 2018), quoting Hill, 852 F.3d at 384. This is so because, while Sergeant Stockett was questioning Defendant, Deputy Oziemblowsky was still attempting to obtain a conclusive answer from MECCA 911 as to the proper status of the vehicle's registration. It is at this point that Stockett hands Oziemblowsky, who is headed back to his patrol car to continue investigating the status of the registration with MECCA 911, Defendant's identification in order to for Oziemblowsky to run that as well. Indeed, "[v]*erifying the registration of a vehicle* and existing insurance

coverage, and determining whether the driver is subject to outstanding warrants" are proper actions within the scope of a traffic stop. U.S. v. Hill, 852 F.3d 377, 382, (4th Cir. 2017) (emphasis added), quoting Rodriguez, 135 S.Ct. at 1615. Moreover, any slight delay in ascertaining the registration was not attributable to the officers, but rather - if to anyone - to MECCA 911 dispatch, as Deputy Oziemblowsky testified that a personnel shift change occurs typically at MECCA 911 at 10:30 p.m. - i.e., during the stop.

Moreover, a conversation between the two officers at 22:25:00 makes clear that Oziemblowsky is still trying to complete the necessary tasks for the stop, and still had a number of things he was still trying to do. In fact, Oziemblowsky tells Stockett that the drug sniff will have to wait because he is not finished with the tasks incident to the stop, and not yet free to come watch the two men while Stockett runs the dog:

> Stockett:      Whenever you're ready, we'll get them out, and I'll have you watch them while I do the dog.
> Oziemblowsky: Okay. I've got another unit coming, and I'm still waiting on a return on him, and I haven't even had a chance to run this yet, so…
> Stockett:      I'll stay up there and keep an eye on them, then. Let me know whenever you're ready.

This particular inquiry frequently arises when defendants are detained long enough for a K9 unit to *arrive* on scene and a sniff to be conducted. See, e.g., Rodriguez, 135 S.Ct. 1609; U.S. v. Williams, 808 F.3d 238 (4th Cir. 2015). However, here, there is no dispute - and the video confirms[2] - that Sergeant Stockett and his K9 dog were on scene from the beginning. While "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop generally does not implicate legitimate privacy interests" protected by the Fourth Amendment, Caballes, 543 U.S. at 409, "a dog sniff around the vehicle's perimeter for the purpose of detecting narcotics 'is not an

---

[2] At 22:17:00, as Oziemblowsky opens the door of his patrol car to step out, the K9 dog can be heard barking in the background.

ordinary incident of a traffic stop,'" Bowman, 884 F.3d at 210, citing Rodriguez. However, a dog sniff is permissible "as long as the police do not 'extend an *otherwise-completed* traffic stop in order to conduct' these unrelated investigations." Bowman, 884 F.3d at 210, quoting Williams, 808 F.3d at 245 (emphasis added); Hill, 852 F.3d at 384 (presence of K9 "contemporaneous with the officers' diligent pursuit of the mission" permissible, contrasting Rodriguez' finding of unlawful extension of a stop "seven or eight minutes after the purpose of the traffic stop was complete"). Indeed, the parties agree that a dog sniff is constitutionally acceptable if it occurs within the time required to issue a citation. (ECF No. 65 at 7).

The clear facts on this point are that Stockett had been waiting for Oziemblowsky to be able to step out of his patrol car and watch the two men while he conducted a dog sniff. Oziemblowsky decided to assist Stockett with the dog sniff while waiting to hear back from MECCA 911 as to Townsend's license status, got out of his patrol car, and convened with Stockett by the side of the road. As they were about to begin the dog sniff, MECCA 911 radioed back with Townsend's license status.

Defendant argues that the officers at that point were no longer waiting for information needed to complete the stop. Defendant's implication, apparently, is that the officers were required to abandon the dog sniff they were about to conduct, issued a citation instead, and concluded the stop, citing Rodriguez. (ECF No. 65 at 7). However, in Rodriguez, the Defendant was detained, and a dog sniff conducted, *after* a citation had already been written and the officer conceded that "all of the business" of the stop was taken care of. That is not the case here.

The determinative question is not whether the dog sniff occurs before or after a citation is written under Rodriguez, but whether the sniff unreasonably prolongs the detention after it should reasonably have concluded. The pat-down of Defendant occurred approximately twenty-

one minutes into the stop, which is consistent with the duration of similar stops found permissible. In United States v. Hill, a traffic stop lasting twenty minutes was not extended "beyond the time reasonably required to complete the stop" when the officer had not finished writing summonses. 852 F.3d 377, *382-84 (4th Cir. 2017). Moreover, "the presence of the K-9 unit on the scene was *contemporaneous with* the officers' diligent pursuit of the mission of the stop." Id. at *384 (emphasis added). The facts here, as in Hill, do not support a conclusion that the officers executed the stop "in a deliberately slow or inefficient manner." Id.

This is especially true for two reasons. First, Townsend asked the officers permission to arrange to have a family member come get the Volkswagen as opposed to having to abandon it by the side of the road, and that he had only been able to speak to his mother on the phone approximately twenty minutes into the stop to explain where the vehicle was exactly - just moments before the pat down of Defendant was conducted. Second, and more importantly, the officers themselves – despite finally having received information on Townsend – were still awaiting arrival of the "shift car" to assist in concluding the stop. Oziemblowsky clarified at the hearing that the other "shift car" he had already requested was needed to assist in wrapping up the stop because Oziemblowsky and Stockett were on a specific detail concerned with conducting traffic stops and narcotics enforcement. As a result, further general or administrative tasks associated with a stop, including transporting persons to the jail, etc. are delegated to regular officers on "shift" so that Oziemblowsky and Stockett can remain on the task assigned. And, as discussed above, the video does not show the responding shift car officer's presence at the time the dog sniff was conducted. Indeed, the third officer is not seen on the scene until much later – slightly *after* the pat down was conducted.

Accordingly, the issue of writing a citation aside, the undersigned cannot say that the "all of the business" of the stop was concluded, all of "tasks *tied to* the infraction" were complete, Bowman, 884 F.3d at *210, quoting Rodriguez, or that all of the "related safety concerns," Rodriguez at 1611, were attended to when either the dog sniff *or* the pat down occurred.

As a result, the undersigned finds that the duration of the stop was not extended to accomplish the mission of the stop, that the officers were diligently pursuing incidents reasonably related to the stop, and that the stop was not otherwise completed. As a result, the *detention* need not be independently justified on the basis of reasonable suspicion as it was not extended beyond the reasonable duration of the stop. Moreover, this is true of both Townsend and Defendant, regardless of Defendant's status as a mere passenger.

3. **A passenger is not free to leave an ongoing traffic stop before it concludes merely because he has no involvement in the traffic violations that gave rise to the stop.**

As a result of Townsend not having a valid driver's license and the Volkswagen being unregistered and uninsured, Townsend could not continue driving once the stop had concluded. In fact, no one could legally drive the Volkswagen because it was not legal to drive. Rather, the Volkswagen would have to be towed, and Defendant would have to leave the scene of the stop by some other means.

Defendant raises two possible means by which he could have departed the scene of the stop had he not been detained. First, Defendant articulated his intent to call an Uber to pick him up, which was not permitted during the detention, though he was told the officers would assist him with that afterward. Second, Defendant argues that he "expressly requested" to walk away from the stop (asking "Am I being detained?" to which Stockett responded in the affirmative), which Defendant contends was wrongfully denied. (ECF No. 65 at 8-9).

The undersigned briefly notes that, contrary to the Government's assertion at the hearing, with which Sergeant Stockett agreed, West Virginia Code § 17C-7-13 does not affirmatively prohibit pedestrian travel on interstate highways as a matter of law. Rather, prohibition is discretionary and subject to the requirements articulated in § 17C-7-13, which provides that:

> The state road commission **may** by resolution or order entered in its minutes and local authorities may by ordinance with respect to any controlled-access roadway under their respective jurisdictions **prohibit the use of any such roadway by pedestrians,** bicycles, or other nonmotorized traffic or by any person operating a motor-driven cycle.
> The state road commission or the local authority adopting any such prohibitory regulation **shall erect and maintain official signs on the controlled-access roadway on which such regulations are applicable** and **when so erected** no person shall disobey the restrictions stated on such signs.

W. Va. Code § 17C-7-13 (emphasis added) – hence, the lengthy testimony and argument at the hearing regarding whether Defendant could have walked away from the scene of the stop, by which means, and whether there were signs on I-79 between the Pennsylvania-West Virginia border and Exit 155 stating that pedestrian traffic was prohibited. It is also not clear that Defendant could not have been picked up by an Uber at the scene of the stop. However, because these arguments are precluded by Supreme Court and Fourth Circuit precedent, the undersigned does not address these issues at length.

"[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 886 (1997). "Th[e] protective interest [in officer safety that justifies a Terry frisk] is not attenuated because [one is] a passenger and not the driver of [a] vehicle." U.S. v. Braxton, 456 Fed.Appx. 242, *247, 2011 WL 5966864, **4 (4th Cir. 2011). Particularly instructive on this point is Arizona v. Johnson (cited in Defendant's brief) in which the Supreme Court described the traffic stop encounter, and a passenger's rights during same, as follows:

> The temporary seizure of driver **and passengers** ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave . . . **A** reasonable **passenger** would understand that **during the time a car is lawfully stopped,** he or she **is not free to terminate the encounter with the police and move about at will.** Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free "to depart without police permission." <u>Brendlin</u>, 551 U.S., at 257, 127 S.Ct. 2400. **[The officer] was not required by the Fourth Amendment to give Johnson an opportunity to depart without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her**.

555 U.S. 323, 324, 129 S.Ct. 781, 783 (2009) (emphasis added). Accordingly, Defendant's arguments that he should have been permitted to walk away or attempt to have an Uber come pick him up are foreclosed.

### 4. Reasonable suspicion that a person may be armed and dangerous to support a frisk

"After lawfully stopping a vehicle, police officers may frisk any occupant of the car if there is 'reasonable suspicion that the person subjected to the frisk is armed and dangerous.'" <u>United States v. Brooks,</u> 685 Fed.App'x. 229, \*232 (4th Cir. 2017) quoting <u>Johnson,</u> 555 U.S. at 326. Courts look at the "totality of the circumstances" of each case, <u>Arvizu,</u> 534 U.S. at 273, for "'specific and articulable facts' demonstrat[ing] at least a minimum level of objective justification for [believing] that criminal activity is afoot." <u>Branch,</u> 537 F.3d at 337, quoting <u>Wardlow,</u> 528 U.S. at 123. The reasonable suspicion standard is "less demanding [] than probable cause and requires a showing considerably less than preponderance of the evidence." <u>U.S. v. Foreman,</u> quoting <u>Wardlow,</u> 528 U.S. at 123. In addition, factors that alone are consistent with innocent travel may, taken together, constitute reasonable suspicion. <u>U.S. v. Sokolow,</u> 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). When considering articulated factors together, they must be "probative of behavior in which few innocent people would engage . . . [i.e.,] eliminate a substantial portion of innocent travelers [to] satisfy reasonable suspicion." <u>Foreman,</u>

369 F.3d at *781.[3]

The facts here as to "armed and dangerous" are fairly analogous to the facts in Johnson, minus the gang activity. 555 U.S. at *781 (officer's pat-down of a backseat passenger was upheld "[a]fter learning that Johnson [had suspected potential affiliation with] a Crips gang[,] had been in prison," and that the registration of the vehicle was suspended, as facts sufficient to suspect he was armed and dangerous).

An eyewitness or informant who reports to police that they observed a person with a firearm – unsurprisingly – provides reasonable suspicion that the person may be armed and dangerous, sufficient to justify a frisk for officer safety. United States v. Robinson, 846 F.3d 694, *700 (4th Cir. 2017) (en banc). In absence of a direct reason of this type to believe a person is carrying a weapon, however, reasonable suspicion of criminal activity can – under some circumstances – suffice. In the Fourth Circuit, reasonable suspicion of criminal activity (of varying types), has been found to support a reasonable inference that a person may also be armed and dangerous sufficient to justify a Terry frisk. See, e.g., U.S. v. Braxton, 456 Fed.Appx. 242, *246, 2011 WL 5966864, **3 (4th Cir. 2011) ("car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize officer safety, and thus justifies and protective frisk under Terry." (internal citation omitted); U.S. v. Roach, 447 Fed.App'x. 993, **998, 2012 WL 14944150, **3 (4th Cir. 2012) (officers had "reasonable suspicion that Roach was engaged in drug crimes, and accordingly, reasonable suspicion that Roach was carrying or using a weapon"). U.S. v Robinson, 846 F.3d 684 (4th Cir. 2017) ("an individual who was seen both loading and concealing a firearm in that [a] parking lot [known for drug

---

[3] Although the "eliminate a substantial portion of innocent travelers" test has been questioned, State v. Evans, 235 Ariz. 314, 332 P.3d 61 (App.2014), the emphasis on innocence considerations has not been abandoned in the years since, Slocumb, 804 F.3d, and has been cited approvingly as recently as 2018. Bowman, 884 F.3d at *213.

activity] may well have been doing so in connection with drug-trafficking activity, making his possession of a firearm even more dangerous."); U.S. v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing the "numerous ways in which a firearm might further or advance drug trafficking")." But cf. U.S. v. Powell, 666 F.3d 180 (4th Cir. 2011) (criminal history of unknown recency for armed robbery and a suspended license, in absence of more, did not support reasonable suspicion that Powell was armed and dangerous).

It would appear, then, that if the officers here possessed reasonable suspicion that Defendant was engaged in drug activity, they also had reasonable suspicion to believe he may be armed and dangerous, justifying the frisk. As such, the inquiry turns next to reasonable suspicion that Defendant may have been involved in drug activity.

### 5. Reasonable suspicion that Defendant may have been engaged in drug activity

Defendant's arguments as to the weakness of Oziemblowsky's logic connecting *most* of the relevant facts known to him[4] about Defendant are well-taken – i.e., Defendant having served time in federal prison for a drug offense, a connection to the Bronx, being present in a vehicle with a registration discrepancy, misstating Townsend's first name, having had one pocketknife which he claimed to have left in the vehicle, and Defendant informing the officers that he was recording the encounter.

The Government cites no case in which a detainee's informing the police that he is recording the encounter has been found to support reasonable suspicion of either criminal activity or that an individual is armed and dangerous, regardless of the manner in which he says

---

[4] What was known to Sergeant Stockett but not communicated to Deputy Oziemblowsky – i.e., Defendant's prior conviction for unlawful possession of a firearm – is not properly imputed to Oziemblowsky in considering whether he had reasonable suspicion to believe Defendant was armed and dangerous under the Collective Knowledge Doctrine. U.S. v. Massenburg, 654 F.3d 480 (4th Cir. 2011).

it, nor has the undersigned located any. Although the officers testified that they found not the the fact that Defendant had informed them he was taking video of the encounter, but the manner in which he did it, to be "suspicious," the undersigned cannot agree. The manner in which Defendant states – to each officer – that he is recording the encounter is matter-of-fact, and – as an African-American man detained by the police in America, in 2018 – perfectly reasonable. The undersigned finds that these statements made by Defendant are not suspicious, even when considered in light of the other cited factors.

Although it is a close call, the rest of the facts – even taken together – do not necessarily clearly rise to the level of those facts typically found to support reasonable suspicion of drug involvement. U.S. v. Branch, 537 F.3d 328 (4th Cir. 2008) (factors that could form the basis for a reasonable suspicion of narcotics trafficking, when combined, included a "prior traffic stop of the [same vehicle] in a drug-trafficking area, Branch's evident nervousness, the presence of air fresheners, and the fact that Branch was driving a car not registered to him); U.S. v. Roach, 447 Fed.App'x. 993, 2012 WL 14844150 (4th Cir. 2012) (informant tip that Roach was involved in distributing heroin; observed interactions consistent with drug transactions with several vehicles that day; discovery of heroin in one vehicle leaving the residence which had been purchased from Roach; and a narcotics-detention dog's alert on another departing vehicle constituted reasonable suspicion that drugs were present in the car). Cf. U.S. v. Slocumb, 804 F.3d 677, *683 (4th Cir. 2015) (hurrying companion to finish transferring a car seat, keeping his head turned and avoiding eye contact, and giving low, mumbled responses did not give rise to reasonable suspicion even when present in a parking lot known as a place for drug activity late at night); Williams, 808 F.3d 238 (4th Cir. 2015) (driving a rental car, traveling on a "known drug

corridor at 12:37 a.m.," and differing stories as to travel plans did not add up to reasonable suspicion).

Although Oziemblowsky testified that the Bronx was a "source city" for narcotics into West Virginia, that too is tenuous for a few reasons. First, Oziemblowsky testified that the basis for this conclusion was a *single conversation, about a year ago* with other officers who indicated there was a suspicion of drug activity coming into Morgantown. Second, even Sergeant Stockett agreed on cross examination that being from New York City is not a reason to suspect criminal activity. Moreover, as Defendant points out, I-79 is not a travel route between the Bronx and Morgantown, so there is little logical connection between his location that evening and narcotics trafficking on that basis, even if the Bronx was a "source city." Though Oziemblowsky later stated that although the two men were coming from Ohio, he also considers Ohio to be a source of drugs as well, he did not elaborate any further.

However, even if those factors were not sufficient, with the addition of the K9 dog's alert on the vehicle – which took place, permissibly, *prior* to the frisk of Defendant – the undersigned believes the combined totality of the factors articulated combined with the canine alert can fairly support reasonable suspicion of drug activity. After all, a canine alert frequently constitutes probable cause to search, Florida v. Harris, 568 U.S. 237, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), – a higher standard than reasonable suspicion. And reasonable suspicion of criminal activity – expressly including narcotics – can support reasonable suspicion that a Defendant may be armed and dangerous, sufficient to justify a Terry frisk. Roach, 447 Fed.App'x. at 998.

Even if the officers were subjectively focused on finding narcotics as Defendant alleges, which may very well have been the case, their subjective states of mind are irrelevant to the inquiry. Whren, 517 U.S. at *806 ("this Court's cases foreclose the argument that ulterior

23

motives can invalidate police conduct justified on the basis of probable cause . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.") (internal citation omitted).

## IV. CONCLUSION

For the above reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence (ECF No. 49) be **DENIED**.

Any party may, **on or before Thursday, April 12, 2018**,[5] file with the Clerk of Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be

---

[5] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011) and United States v. Mason, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011).

In this case, the pretrial motions deadline was originally March 6, 2018. (ECF No. 22). That deadline was extended, via numerous motions for extensions of time to file pretrial motions, to March 13, 2018 (ECF No. 24), March 14, 2018 (ECF No. 26), March 21, 2018 (ECF No. 29), March 23, 2018 (ECF No. 44), March 26, 2018 (ECF No. 46), and – most recently – March 27, 2018 (ECF No. 47). The undersigned raised the issue of calendar exigency that granting the motion would clearly create with the parties at various points along the way, with the parties being advised of the implications the delays would have for response times. However, the Government did not object to Defendant being given until March 27th to file pretrial motions, even though the Government's deadline for responding would remain March 28th, because the Government indicated to the Court that it would not take long to draft a response. (ECF No. 47, reiterating in the Order that "The Government's response remains due on March 28, 2018). Subsequently, on March 28, 2018, the Government filed a "Objection to Defendant's Motion to Suppress" that was unaccompanied by a supporting memorandum, and stated only in a single paragraph that the Government "disagrees with the facts as presented by defendant, as well as defendant's conclusions . . . and will submit a memorandum addressing the evidence presented following the suppression hearing." (ECF No. 52). The Government neither requested nor received permission of the Court to file its memorandum later than the established deadline of March 28, 2018 before it unilaterally informed the Court (and Defendant) via its one-paragraph objections that it would do so.

The motion hearing commenced at 1:40 p.m. on March 29, 2018. By 4:17 p.m., the Government had made it through exactly one witness, with at least two other witnesses in total expected to testify. Accordingly, it became clear that the hearing could not be concluded that day. The next day was Good Friday, and limited availability of staff and personnel made it impractical to reconvene the next day. Accordingly, the motion hearing resumed at the next available opportunity, on April 2, 2018, and concluded that same day. On April 3, the Government's supporting memorandum was filed – six days later than scheduled. Defendant's reply memorandum was filed the next day – April 4, 2018.

As a direct result of the parties' combined actions, and given the pretrial conference scheduled for April 16, 2018 (ECF No. 27), the resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to one (1) day.

24

submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon the Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 717 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208; Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of Court is **DIRECTED** to provide a Copy of this Report and Recommendation to counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on **April 11, 2018.**

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE